Good morning, Your Honor. May it please the Court, Peter Amfrasiadi on behalf of appellant Dr. Michael Kaufman. Your Honors, I will attempt to reserve five minutes for rebuttal, and I will keep my eye on the clock. All right. This Court should reverse, because on this record, the facts and the inferences taken from those facts and the like most favorable to Dr. Kaufman, especially if gauged by the facts, there is indeed a genuine issue of material fact as to whether the defendant lacked a reasonable basis to believe the statement it issued, namely the plaintiff was unable to meet job standards, and indeed did so and said so recklessly, not merely negligently, but recklessly. On this record, given the facts and given the procedural posture at summary judgment, I don't think the reasonable jury could possibly find malice when you take these facts and you filter them through the substantive California law that's been addressed in the briefs. Fundamentally, on the factual front, if we get to the nitty-gritty of those facts that exist in this record that show one could not have harbored the belief that he was unable to perform job standards, and indeed could have only said it recklessly, we can start with at the initial conversation in November of 2009, and even before that. In the record, it's clear Dr. Kaufman had been told there are some business issues with respect to your position. That's at page 667 and 670 of the record. They had also said that they were dropping some of their business lines, and that's at page 567 to 568 of the record, and pages 616 to 617. And then in November of 2009, when Joe Hannison, who had only taken over as the direct supervisor of Dr. Kaufman a couple months before, and that's a disputed issue in the record, they say it occurred much before, but Dr. Kaufman says, no, it was two months before, and that's the fact today. He told Dr. Kaufman, people like you. Now, he also said that there have been some inchoate comments about some people having a hard time working with you, and so what he said is, you can find another job within the company, and he specifically said, and this is at pages 583 to 584 of the record, he would actively help Dr. Kaufman find another position. Or he could take a corrective action plan to address whatever those inchoate comments were, comments which, by the way, were never substantiated. Now, if someone is so unable to perform their job, that they are failing basic job standards, and indeed doing this litany of terrible things that have been said, he's sleazy and slimy and he makes inappropriate religious jokes, if all of that is to be believed, why were they offering to help find him another job within the company? That is a massive collision on a fundamental issue in this record. Well, but if someone is unable to perform job standards because of those types of issues, he's salesy and sleazy and makes inappropriate religious comments and jokes, that transcends any category. I mean, I don't think there's any job within United that could justify that kind of behavior. And so what you have then is, after the litigation, they've tripped all over themselves to try to justify the statement. Because you now have post-litigation statements by Johanneson that are fatally inconsistent with what he did before there was a lawsuit. For example, now they say, in deposition, that we spoke to Dr. Kaufman. Dr. Kaufman says, that never happened. Johanneson now says, on the day when I told him, we're not going to let you stay at the company, Dr. Kaufman said, I understand. That never happened. That's their version. And they can tell the jury that. They can tell the jury that Dr. Kaufman knew it, he understood it. But Dr. Kaufman says, that didn't happen. And in summary litigation generated cover-up, so to speak. I mean, they've tripped over the real facts. And that shows, it's significant. When you peel the onion back. That shows that at the end of the day. When you filter it through this malice and ill will standard, as I understand it, the question is whether United Health had a reasonable basis to believe the truth of these statements about his performance. And if I get your argument, you're saying they might have, or they might not have, but we don't know because it's a factual question depending on whose testimony you believe? To a large extent, yes. I agree with your statement about the law. I think Sanborn, Romer, all the cases we've cited deal with this dual-pronged standard about whether the defendant possessed a reasonable basis to believe the truth of the statement. And our argument is that they could not have possessed a reasonable belief. They were reckless in saying it. That comes from looking at the facts in the record that I was just talking about, especially when you filter those facts through the California cases we've cited, which cases have looked at this. And when you look at the case law, for example, and this is why Dr. Coffman's denial of the fact that he allegedly agreed with the termination and understood why he was being terminated. In California, the Kennedy case is an important case, and this is a case that they rely on. And had Dr. Coffman said in this case, yes, I did understand. And had Dr. Coffman said in this case, yes, then under King, there wouldn't be a showing of malice. I mean, that was, in effect, the King case. In King, the court said, you don't get to go to a jury on malice when you yourself admitted to the issue at stake. But Dr. Coffman didn't, which is why this case then falls within the orbit of the other cases we've cited, Sanborn case, the Cruy case, Hailstone, the Duesday case. And there's one other case I would add that's cited in Sanborn. It's a California Supreme Court case, and I apologize we didn't address it in the briefs. But the Sanborn case we did address cites this California Supreme Court case. It's Cunningham. And the Cunningham case is one Cal third 301. At page 308 in particular, you can look at those facts. And it was a jury decision where a jury found malice. And the California court said substantial evidence supports the jury's finding of malice. And when you look at the specific facts that were in that record, they're like the Sanborn facts or the Cruy facts. And they engraft similarly onto the facts here. The other significant fact here about why they could not have harbored this belief is that when you look at page 367 of the Sanborn record, this is from Mr. Sparkman's deposition. He says that he was told by Johanneson that Dr. Coffman said that I don't want a corrective action plan. Dr. Coffman says I never said that. So you have this person, Johanneson. And that brings my second question I would like to hear your position on, and that is the standard of preponderance versus clear and convincing. And is there any clear and convincing case that tells us which standard we should apply? I think there is a clear and convincing case that tells you which standard should apply. And I think that case is the Romer case and the Sanborn case. I think in Romer and Sanborn, the Court said that malice in these slander cases, and there it was malice for purposes of punitive damages, but the malice issue is no different substantively in terms of what burden of proof was graft onto it. They said that malice is indeed subject to the preponderance of the evidence standard, not the clear and convincing standard. And in a case like this where you're talking about a conditional privilege where it's a private individual, Dr. Coffman, and a company, this is not a matter of public concern, public interest, a public concern. The clear and convincing elevated standard applies from New York Times v. Sullivan in the cases because you're balancing two different liberty interests. You have the individual's liberty interest to preserve his integrity and reputation, which here is massively important for Dr. Coffman. United is one of the biggest companies in health care in the business. He's blacklisted from working for anywhere from a quarter to half the market effectively. I mean, this is incredibly damaging. So you have that liberty interest. And in your traditional New York Times v. Sullivan type case where it's a matter of public concern and public reporting, you have the constitutional interest in free speech and free press and the press's ability to communicate. And that balancing has led to saying clear and convincing. But where you don't have the same balancing, which is the situation we have here, the preponderance of the evidence standard makes more sense. The only liberty interest at stake here is Dr. Coffman's liberty interest and his reputation. Holding him to that higher standard that applies because of the need to protect the press doesn't make any sense. And so I think that's why when you look at Sanborn and Romer and the underlying logic behind them and the cases they descend from in terms of slander and clear and convincing and malice, it makes complete sense to adopt the preponderance standard and to see the cases as having done that. I see I'm into my rebuttal time. Unless the Court has any other questions. Thank you. I will save my time for rebuttal. Thank you. Good morning, Your Honor. Laura Shelby on behalf of the UnitedHealth Group and the appellees. We feel that this Court should affirm the District Court's summary judgment ruling on the claim for defamation. It's a very narrow issue. This Court has to decide, the same as the District Court, is whether the plaintiff has submitted any evidence of actual malice as to this one statement, which is HR's recordation internally in their database that Dr. Coffman was terminated for performance. That's it. All these other comments that he refers to are not at issue. It's an internal comment. So there's no dispute that a plaintiff has submitted evidence. It's a conditional privilege. It's an internal comment. Therefore, the burden fell on Dr. Coffman to show at the summary judgment stage, which was fully briefed and he had every opportunity to identify what evidence he had of actual malice on the part of the speaker. Here we don't know who checked the code in the database of termination, you know, picks a code when someone's terminated. And someone in HR picked that. We know it's because Mr. Johannesson, who was the supervisor, who came to the conclusion that Dr. Coffman was not doing what he needed to do in his job, did tell HR, I've just terminated Dr. Coffman for performance. That's it. Okay? That's all we're talking about here. There is no evidence in the record that Mr. Johannesson did anything. He liked Dr. Coffman. Dr. Coffman liked Mr. Johannesson. Didn't even attempt to put anything in the record about that. So what we're talking about now is whether Mr. Johannesson, in reckless disregard of some other fact, terminated him. And really at heart what we're getting at here is that Dr. Coffman just doesn't understand that anybody could think his performance was not exemplary. That's it. But an employer is entitled to have its own judgment and estimation. Mr. Johannesson worked with Dr. Coffman. He worked with Ms. Haltom, who was the supervisor before that. And he came to the conclusion that Dr. Coffman just wasn't doing a good enough job in this role. Now keep in mind, and I'm going to talk a little bit about the facts, that Dr. Coffman was hired to do sales. He was the expert that's brought in when they go and market United Health Group's materials. At the time he was hired and interviewed, even Dr. Coffman said, you know, this isn't really my strong suit. Can I look for other jobs internally? And he was told, sure. We know from the record almost immediately Dr. Coffman started looking for other types of jobs in United Health Group because the sales position, it wasn't his strong suit. We know in June 2009, Dr. Coffman flew to Minnesota to talk to executives at United Health Group. Hey, are there any other positions that might work for me? We know that Mr. Johannesson talked to him about, let's see if we can find you other positions, set him up with Dr. Sparkman to try to find another job. So there's no dispute that this was not the right job for him. Was Dr. Coffman, did he have some strong suits? Yes. He's got a great resume. He went to Harvard and Yale. When I came to the sales job, he just wasn't cutting it. So in November, Mr. Johannesson says, you know what, we could put you on a corrective action plan, but that would mean you couldn't keep applying for jobs internally because it's a matter of policy if you're on probation or a cap. You can't do it. Dr. Coffman says, I'm going to keep looking for a job. And he does. He doesn't find one by the time it's January and he's talking about his one supervisor's assessment that he's not performing well enough in his job. He sends an e-mail internally that says, he's decided to leave. We wish him all the best. And he tells HR, I've terminated him for performance. That's it. There's nothing in the record at all under any standard. I don't think it matters whether you, I don't think you even have to get to the issue of whether it's a clear and convincing or a preponderance of the evidence. I would ask you about that if we were to determine that it's a preponderance rather than clear and convincing, how that would affect your argument. I don't think it makes any difference. I don't think it makes any difference. I'll take the preponderance standard. There isn't any clear and convincing case on point, he cites, to the New York Times cases. There isn't one in fact pattern like this where it says it has to be preponderance or clear and convincing. The cases I did want to refer to you, though, when you're talking about a number of cases that are cited, it's where someone makes a statement, one of them is, I think he was, you know, doing a con job on me. You know, you're accusing someone of a specific thing that's wrong. An example would be if Mr. Johannesson thought that UnitedHealth Group had lost a big customer because of something Dr. Kauffman did and said, I'm terminating you because you lost a big customer. And then he finds out that actually Dr. Kauffman wasn't responsible for that. And yet he fires him anyway and tells people, hey, I'm firing Dr. Kauffman because he lost a big customer. That could be perhaps reckless disregard. Here it's just, I didn't think he was performing well enough. That's it. There are not facts of showing reckless disregard or malice or ill will. And without that, you know, the district court properly granted summary judgment on this case, on that claim and all of the others. Thank you. I would like to address a few of the points just briefly. I think one of the first is the issue of this was just some internal recordation. It's some ministerial type thing. That's not accurate. In the record, while that's partially accurate, there was an internal recordation made. And then the HR person from one company to another company at page 704 said he's unable to do this, exclamation point. That person then forwarded on to another person, Klucus it is, to Meadows. That's page 704. You also, though, have at page 618 and 670 of the record the fact that this publication was made to the state. And that's at page 618 and 617. And that's part of the significant damage to Dr. Kauffman because the state unemployment office at the time was told these misstatements. And so it's not just that this is some dispute about whether he could perform or not. What we're talking about is the recklessness in saying it. But forwarding that on to the state, you still have a burden then of showing that it was maliciously forwarded. That it was recklessly stated, yes. Okay. But you can't rely on the publication to the state unless the actor who published it to the state did so maliciously or recklessly. Yes, and that the company did so, Your Honor. I mean, the company forwarded it on to the state. And the only way the company could forward it on is because it was recorded in the database. I mean, if the logic is taken to its extreme of, and I think this was sort of a This is the public, this is the publication, but you've got to trace it back to somebody who is malicious. Is that person Johanneson? Yes. Okay. And what's the evidence that he did so maliciously? Everything I said earlier and specifically, Johanneson never saw Dr. Kaufman interacting with clients. Page 354, he admits it. He was only his supervisor for two months, page 334, paragraph 8 in the record. He didn't have the basis to have come to the conclusion that he couldn't perform job standards. And then when you look at the background context of the other All of that shows that Johanneson may not have been doing a very good job at what he was doing. It doesn't prove malice. I disagree, Your Honor. I think it does show recklessness. It's not mere negligence. That's not just a, you know, oh, I don't know one way or another. I'm just going to say he can't perform. What we also saw is that Johanneson lied to Sparkman about whether Dr. Kaufman was willing to take a cab. That's significant. If Johanneson was just indifferent to the whole situation and just made a mistake coding it, it was really supposed to be coded fired because we don't like the color of his tie. He wouldn't be lying to other people and he wouldn't then be engaging in what at this juncture with the inferences have to be taken as lies, given what's been said in the declarations, the way it collides. I'm curious to why Mr. Johanneson would have done such a thing. He didn't like Dr. Kaufman. He clearly didn't like Dr. Kaufman. He had only worked with Dr. Kaufman for two months, yet, and he didn't have a basis to come to a conclusion that Dr. Kaufman couldn't perform by his own admission. Yet he now says that Dr. Kaufman was making inappropriate jokes and was doing all this terrible stuff, which hasn't been substantiated. So the only conclusion can be that there was deep personal animus, and it was certainly enough to establish recklessness. When you look at the reviews that Dr. Kaufman received, they were, the overall grade was effective for his prior two years. He had one that was slightly below effective, and he had outstanding for ethics and integrity. Yet, and that was, that's the record evidence. You have him never having been told he had these problems that Johanneson says, no, I was telling him all along he had problems. But Dr. Kaufman says, no, you weren't. At this juncture of summary judgment, the inference has to be he wasn't being told that he had problems, and they're now not telling the truth. They're dissembling about it, and that's significant. I think that's part of the reason why this has to go to the jury. It's not a question that's susceptible to summary judgment, especially when you filter through those California cases that I addressed earlier. I see I'm out of time unless the panel has any further questions. Thank you very much. No questions here. Thank you, Your Honor. Thank you. I appreciate the argument from both counsel this morning. The case of Kaufman v. UnitedHealth is submitted, and we're adjourned for the morning. Thank you, counsel. Thank you.
judges: McKeown, Gould, Bybee